# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DWAINE WRIGHT,                    :

      Petitioner,              :      Case Nos. 3:04cr00003
                                3:10cv00174

  vs.                             :

UNITED STATES OF AMERICA,         :      District Judge Thomas M. Rose
                                  Chief Magistrate Judge Sharon L. Ovington

      Respondent.              :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.  <u>Introduction</u>

Petitioner Dwaine Wright stands convicted, following his jury trial, of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  He is in federal custody serving a 220-month sentence.  His conviction and sentence were affirmed on direct appeal. (Doc. #s 137, 138).

At sentencing the Court concluded that Wright's prior convictions bumped him into the category reserved for armed career offenders under 18 U.S.C. § 924(e), thus increasing the length of his sentence.  (Doc. #128, PageID at 1273-74).  Wright claims that his 220-month sentence is longer than the sentence he would have received if his trial counsel had

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

provided him with constitutionally effective assistance during plea negotiations.  This claim

is before the Court upon Wright's Motion to Vacate, Set Aside or Correct Sentence under §

2255 and his related filings (Doc. #s 145, 154, 173, 188), the Government's Answer, Motion

to Dismiss, and Response (Doc. #s 152, 190), the record of an evidentiary hearing during

which Wright was represented by counsel (Doc. #s 169, 175), and the record as a whole.

## II.    Background

### A.    Wright's Claim

Wight's affidavit frames his ineffective-assistance claim around his alleged pre-trial

desire to plead guilty rather than proceed to trial:

> I, Dwaine Wright, was the victim of Ineffective Assistance of Trial
> Counsel by Tom Anderson, Attorney at law, when he failed to initiate and/or
> participate in plea negotiations, even after being instructed by the Trial Court
> and requested by Myself to do so.  Anderson refused to initiate, participate [in]
> or even consider a Plea Agreement and insisted he could win the case.  I told
> Mr. Anderson that I wanted to plead guilty and accept ten (10) years from the
> government, b[ut] Anderson ignored me and disregarded the Court['s]
> instructions, lost the trial and caused me to receive a much high[er] sentence....

(Doc. #145, PageID at 1420).

Due to factual disputes concerning this aspect of Wright's ineffective assistance of

trial counsel claim, the Court held an evidentiary hearing on September 2, 2011 and

continued on December 9, 2011.  Wright testified during the hearing as did attorney

Anderson and the two Assistant U.S. Attorneys (AUSAs) involved with Wright's

prosecution, Robert Bartlemay and Richard Chema.  Wright's court-appointed counsel was

present and actively engaged in representing Wright during the evidentiary hearing.

**B.**     **Wright's Testimony**

Wright testified during his §2255 evidentiary hearing that he discussed "a lot of things" with Anderson, but he "didn't understand what [Anderson] was talking about." (Doc. #169, PageID at 1779).

When Wright was asked if he recalled whether any plea negotiations occurred, he testified, "My understanding was after the best case-worst case scenario, ... the Judge wanted them to get some numbers so he could place on the record what may have been offered to me." *Id*., PageID at 1781.  Wright noted, "[t]he only conversation we had was the charge carries 15 to life." *Id*.

After the best case-worst case hearing, Wight "was under the assumption the Judge had told them to go get some numbers and bring it back so they could show what has been offered ...." *Id*., PageID at 1784.  Wright testified, "I ... called Tom Anderson and asked him to see if he could get a 10-year plea deal." *Id*., PageID at 1784-85.

Wright did not understand at the time of the best case-worst case hearing that if he was sentenced without the enhancement applicable to armed career criminals, his maximum sentence would be 10 years.  He alleged that attorney Anderson "never had time to talk. When you talked to him on the phone, he rushed you off the phone and we didn't have very many visits; and a lot of times there'd be things I was meaning to ask him and he'd change the conversation, and it just slips from my mind." *Id*., PageID at 1786.  Sometime after the best case-worst case hearing, Wright learned about the possibility of a 10-year sentence.  He testified:

> When I asked [attorney Anderson] about the – see if he could get me the 10 years or whatever, he said, okay, we'll try.  Then he would go on and start talking about, we got this trial coming up; we have to start preparing for this trial and that's what we need to be focusing on right now.

(Doc. #169, PageID at 1786).  Wright asserted that after he asked attorney Anderson about securing a 10-year plea deal, they never had another discussion about plea negotiations.  *Id.*, PageID at 1786-87.

Wright testified that between the time of the best case-worst case scenario hearing and the weekend before trial, he never told attorney Anderson "I want to go to trial" or "I don't want to take any negotiations."  *Id.*, PageID at 1789. When next asked if the subject ever came up, Wright answered:

> Yes.  We w[ere] discussing the trial strategy and I was like asking, you sure you can't try to get me a 10-year deal?  I said, everybody else, you know, pleads guilty and they get like 60 months or whatever.  And he kept explaining about my record being extensive and I was like, I'm willing to take 10 years then; and he said he would try, and the next thing I know I was in trial.
>
> * * *
>
> Had he conveyed that offer to me, I would have took it because after looking at the transcripts from the best case-worst case scenario, [AUSA] Chema said that my criminal history, all those charges w[ere] relatively real old, meaning that they couldn't use them to count my criminal history, and that the misdemeanor charges I had was minor misdemeanors and that they would be grouped together and I probably would have only got three points, meaning my criminal history would have been way away from six, and possibly my guideline maybe would have been like from 60 months to maybe 76 or 77 months, and I definitely would have took that deal versus looking at 15 [years] to life.

(Doc. #169, PageID at 1789-90).  He emphasized, "I didn't want to go to trial.  I was nervous.  I didn't want to go to trial."  *Id.*, PageID at 1790.

4

Wright further testified that the first time he heard attorney Anderson allege that he had obtained a plea deal and offered it to Wright was after he read Anderson's affidavit attached to the Government's response to his §2255 Motion. *Id.*, PageID at 1791. According to Wright, he was not aware of plea negotiations with the Government because every time he would bring it up, Anderson "just changed the conversation" or "switched gears," and "[a]ll he was talking about was trial." *Id.*, PageID at 1793. Wright alleges that Anderson insisted on going to trial. *Id.*, PageID at 1797.

During the evidentiary hearing, the Government's counsel asked (over objection by Wright's counsel), "Is it your position that you're not guilty of the offense which you were convicted of?" Wright answered: "No, I'm not." (Doc. #169, PageID at 1796). He explained, "you can plead guilty but not be honest – I mean but not saying that you're guilty of the charge." *Id.*, PageID at 1797.

**C.  Anderson's Testimony**

Attorney Anderson testified at the evidentiary hearing that Wright "seemed very knowledgeable about the charge," and "he understood what the charges were, what the evidence was against him and what the defense was." (Doc. #169, PageID at 1727).

Anderson acknowledged his lack of specific memory about when Wright's first trial date was set:

> I believe my representation started ... in early '04. That's when I was appointed. I have no idea when the first trial – I'm sure there was one set probably at the scheduling conference. I do recall there was a motion to suppress that was litigated, but I don't recall when the first trial date would have been set.

(Doc. #169, PageID at 1729).  Wright's counsel next asked Anderson whether he recalled

being present at the Court's best case-worst case hearing, which occurred in March 2005.

Anderson answered, "I do not recall that specific hearing coming back.  I'm sure I was there

but I don't ... remember details about that specific hearing but I do recall there being one

done."  *Id*.

Anderson explained that there had been plea negotiations before the best case-worst

case hearing.  He described the substance of those negotiations as follows:

> The problem with Mr. Wright's case was the government felt that he
> would qualify for an armed career criminal enhancement based on his record;
> and at that point, you know, we had – we had looked at his prior criminal
> records, I had discussions with Mr. Wright, and the government basically was
> of the opinion that [a sentence of] 15 years would be applicable to Mr.
> Wright's case.
>
> So at that point we – the best we were talking about was trying to
> negotiate a plea to the gun charge with the understanding that the 15-year
> penalty would be in place, but that was the extent.  In other words, the
> government did not make any representation, that I can remember, that they
> would be willing to do anything but a straight plea to the charge.

(Doc. #169, PageID at 1730).

Wright's counsel asked Anderson if he had discussions with Mr. Wright before the

best case-worst case hearing about the maximum penalties and possibilities of negotiations.

Anderson answered affirmatively.  *Id*., PageID at 1730-31.  When asked about what he told

Wright, Anderson answered:

> Again, it's been a long time and there's been a lot of clients; I don't
> recall specific meetings but I do know that we talked at length about what the
> penalties were because this was a special case.  It was – the charge itself was
> just a felon in possession but because of Mr. Wright's record, it was my

6

opinion he would qualify for this enhancement.

So we discussed that ... there was a 15-year mandatory minimum.  We also discussed what his guideline range would be, which we do in every federal case, and then, you know, the maximum penalties were obviously discussed as well.

(Doc. #169, PageID at 1731).

Wright's counsel next explored whether – before the best case-worst case hearing – Anderson discussed with Wright the possibility of attempting to secure a plea deal where the Government would not seek the armed career criminal enhancement, thus exposing him to a maximum sentence of 10 years.  Anderson testified that he did not discuss this possible plea deal with Wright at that point in time.  Anderson explained:

At this point I was ... operating under the assumption that that was really a sentencing matter and the real question – and I do recall having many conversations with Mr. Wright about whether, in fact he would qualify.  Now ... in my opinion after doing research and looking at the case law, his prior convictions, and I do recall pulling them from the various courts where he received those convictions, it was my opinion that if he was convicted, that he would qualify for the [armed career criminal] enhancement.

So I believe at the best case-worst case scenario, we were still operating under the assumption that if Mr. Wright pled guilty, there would be a mandatory 15-year minimum.

*Id.*, PageID at 1732.  Anderson testified that before the best case-worst case hearing, the Government had not approached him about the "notion of allowing [Wright] to get out from under the ... armed career criminal guideline."  *Id*., PageID at 1735; *see id*. PageID at 1738-39.  This possibility did not arise, Anderson recalled, until just before trial:

[T]o the best of my recollection, it was either the day before or two days before the trial was about to commence.  I met with Mr. Chema – I don't

7

know if it was at a final pretrial conference or if it was just going over exhibits – and he said that if Mr. Wright would forgo the jury trial that they would not press for the [Armed Career Criminal Act] enhancement.

In other words, they would not seek to prove up the prior convictions that would subject him to the penalties.  So this was a couple of days before the trial.  Up to that point, I was operating under the assumption that the government really had no plea offer.  They wanted him to plead as charged and be sentenced as an armed career criminal.

A couple of days before the trial, Mr. Chema said they would not seek to enhance his sentence, so I went to Mr. Wright and conveyed that to him at that time.

* * *

[T]hey said they would not seek to enhance his sentence with the prior convictions.

(Doc. #169, PageID at 1742-43).

Wright's counsel asked Anderson, "Are you telling us then that was a definite offer from the government then to allow him to plead to a 10-year maximum?"  *Id*., PageID at 1743.  Anderson responded, "they said they would not seek to enhance his sentence with the prior convictions."  *Id*., PageID at 1743-44.  Anderson testified that he conveyed this to Wright.  *Id*., PageID at 1744.

Anderson also told Wright that under the plea deal, he could argue at sentencing for less than a 10-year sentence; yet, he advised Wright "that ... realistically the Judge would probably give him the high end of the statutory range ... because of his record."  *Id*., PageID at 1744-45.  Anderson confirmed that the high end of the statutory range was a ten-year sentence.

8

Anderson acknowledged that the Government's offer was not conveyed in writing and that when he searched his case file before the evidentiary hearing (at Wright's counsel's request), he found nothing reflecting the substance of the Government's offer. *Id.*, PageID at 1745, 1748. Anderson could not remember if he took notes about the plea offer or his discussions with Wright, and he did not find any in his case file. *Id.*, PageID at 1748.

As to where his discussion with Wright about the plea offer took place, Anderson stated that to the best of his recollection, it occurred in the Montgomery County Jail, although it was possible the discussion occurred at the Miami County Jail. (Doc. #169, PageID at 1747). When Wright's counsel asked Anderson if he recalled how long the discussion lasted, he answered:

> I know we had a ... candid discussion about, listen, the government has at the last second here offered this and here's why you should take it. I don't know if it took a half hour or if it – I know it wasn't an in-and-out [discussion] but I don't recall the duration of the conversation.

*Id.*, PageID at 1755-56. As to the specifics of this discussion, Anderson testified:

> I know I met with Mr. Wright and urged him to strongly consider taking this offer from the government, but I don't recall if it was immediately after it was presented to me or if it was the next day; but I know that somewhere in the interim that conversation took place.
>
> * * *
>
> Mr. Wright was pretty hard set on going to trial. He wanted to try the case. He felt that – he felt he had a good chance of success with the case.
>
> And, you know, we went back and forth a little bit about, you know, my assessment of the case, so I believe he did make up his decision that he wanted to proceed with the trial pretty quickly. I believe it was at that meeting when I met with him.

9

I don't know if the government had put – I can't remember if they had put any time limits on it; if it was like, listen, we need to know the night before, but I know that my recollection is fuzzy but it was somewhere in that period.

(Doc. #169, PageID at 1751-52; *see id.*, PageID at 1754-55).  Anderson confirmed the statement in his affidavit that he "strongly recommended" Wright accept the Government's plea offer.  *Id.,* PageID at 1733, 1745; *see* Doc. #152, Exhibit 1, ¶6.

Anderson also recalls discussing defense theory with Wright:

[W]e did have a theory of the case that the gun belonged to a roommate, and that roommate [Rodney Chambers] had contacted the Court and took ownership of the gun.  So we had subpoenaed him to come in and to testify that the gun, in fact, was his gun but unfortunately he decided not to testify to that under oath.

\* \* \*

I remember telling Mr. Wright a couple of things, one, that I wasn't sure that Rodney was going to go through with it, quite frankly.

\* \* \*

I do recall in preparation for the trial telling Mr. Wright that there could be problems with him actually going forward with it.  The reason being because [Chambers], in effect, would be pleading out to a federal felony, admitting in open court and more than likely would be arrested as soon as he got off the witness stand.

\* \* \*

... Also I remember discussing with [Wright] the fact even if the jury believed that [Chambers] brought the gun into the house, there could still be some legal issues with whether or not that would absolve [Wright] from any association with the gun.  So we did have discussions about the government's case and also the defense strategy.

*Id.*, PageID at 1753-54.

10

After trial started, Wright did not tell Anderson that he wanted to accept the

Government's plea offer.  Anderson also testified, when questioned by the Government's

attorney, as follows:

Q.  Was there ever a point where [Wright] instructed you not to engage in plea
negotiations and you refused to do so?

A.  No.

Q.  Did you ever tell the defendant that you would not initiate, participate or ever
consider a plea agreement because you insisted you could win the case?

A.  That never happened.

Q.  Was there ever a time while you were representing Mr. Wright that you
refused to talk to the prosecutor about any plea negotiation?

A.  No.

(Doc. #169, PageID at 1760).

### D.  AUSA Bartlemay

Before and during Wright's trial, AUSA Bartlemay represented the Government and

was responsible for Wright's "trial or negotiations and outcome of the case[.]"  (Doc. #169,

PageID at 1766).  During Wright's evidentiary hearing, Bartlemay testified that he recalled

working with AUSA Chema, his  Criminal Chief,[2] to prepare for Wright's trial.

Although the record of this case verifies that the Court held a best case-worst case

hearing in March 2005, Bartlemay did not recall the hearing.  (Doc. #169, PageID at 1765).

He testified that he remembered Wright's case and Wright, himself, and he remembered

---

[2]  More formally, Chema was the Chief of the Criminal Division in the U.S. Attorney's Office for
the Southern District of Ohio.

trying Wright's case alone without Chema present in the courtroom.  But Bartlemay did not

recall any specific plea negotiations – or whether or not any plea negotiations occurred –

with attorney Anderson concerning Wright's case.  During Bartlemay's approximately four

years as an Assistant U.S. Attorney, he worked on many cases involving felony indictments.

*Id.*, PageID at 1765-68.

It was generally Bartlemay's practice to try to resolve his felony criminal cases by

plea negotiations, and negotiations occurred "in almost all cases."   *Id.*, PageID at 1767-68.

Before making a plea offer to a defendant, he needed to clear the offer with Chema.

Bartlemay did not recall Chema telling him that he (Chema) was going to make a plea offer

in Wright's case.  *Id.*, PageID at 1773-74.

### E.    AUSA Chema

During Wright's §2255 evidentiary hearing, AUSA Chema testified that he "vaguely

recalled" the best case-worst case hearing in Wright's case.  Chema was present at the

hearing but he did not recall if AUSA Bartlemay was also present.  Chema did not remember

what specific sentence lengths the parties presented to the Court during the hearing.

When asked if he recalled if he negotiated a plea agreement with attorney Anderson

concerning Wright, Chema answered, "I would not have negotiated the plea – I do not recall

anything of that sort.  I would not have negotiated  Plea Agreement with [attorney]

Anderson because I was not the trial Attorney."  (Doc. #175, PageID at 1821).  He "may

have said something to the effect:  Mr. Anderson, isn't there some way that this can be

worked out?"  *Id.*, PageID at 1822.  But he "would not have negotiated a Plea Agreement"

12

with attorney Anderson.  *Id*.  Chema explained:

> It was my practice to always explore possibilities of working cases out in a reasonable, fair manner within the guideline, the policy Guidelines of the United States Attorney's office manual and U.S. Attorney's policies ....  But I would never have negotiated an arrangement directly with the defense Attorney.

*Id*., PageID at 1822.

Chema had no recollection of conveying a plea offer to attorney Anderson two or three days before trial.  *Id*.  Chema testified:

> I may have said:  Is there a way we can work this out, and a ten-year deal may have been something that might have been acceptable.  I would have worked through the assigned trial Attorney and like I am trying to do the best I can here, but this has been a very long time, you know, I really haven't had any ability to refresh my recollection.  So what I'm saying is, I would let whatever formalized negotiations like the one, I would have had that done with Mr. Bartlemay, I think.

(Doc. #175, PageID at 1823).  Chema also did not remember Wright's trial "at all."  *Id*., PageID at 1824.

## III.  <u>Discussion</u>

A federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitutional or laws of the United States..., or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  To obtain relief under §2255, a petitioner must establish: "(1) an error of constitutional magnitude; (2) a sentence imposed outside the

statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003); *see Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006).

Wright's claimed error of constitutional magnitude arises under the Sixth Amendment, which "guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings.'" *Missouri v. Frye*, __U.S.__, __, 132 S. Ct. 1399, 1405 (2012) (quoting, in part, *Montejo v. Louisiana,* 556 U.S. 778, 786, 129 S.Ct. 2079 (2009) (other citation omitted).  Attorney Anderson represented Wright throughout the critical stages of his prosecution in the District Court – including plea bargaining.  Wright was "entitled to the effective assistance of competent council" during the plea-bargaining process. *Lafler v. Cooper*, __U.S.__, __, 132 S. Ct. 1376, 1384 (2012) (citations omitted); *see Missouri v. Frye*, __U.S. __, __, 132 S. Ct. 1399, 1405 (2012) (and cases cited therein).

"[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland [v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064 (1984)]." *Frye*, __U.S. at __, 132 S.Ct. at 1405 (discussing *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S.Ct. 366 (1985) and *Padilla v. Kentucky,* 559 U.S.__, __, 130 S.Ct. 1473 (2010)).  *Strickland's* two-part test is frequently visited:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064; *see Valentine v. United States*, 488 F.3d 325, 331 (6th Cir. 2007).

Wright contends that attorney Anderson provided him with constitutionally ineffective assistance (1) by refusing to initiate or participate in any possible plea negotiations with the Government, and (2) by failing to tell him about the Government's plea offer – specifically, in exchange for his guilty plea, the Government offered not to seek an armed-career-offender enhancement of Wright's sentence, resulting in a maximum possible sentence of 10 years (the "10-year plea offer"). Wright maintains that if he had known about the 10-year plea offer, he would have accepted it and pled guilty. Prejudice thus befell Wright, in his view, because Anderson's deficient performance during plea negotiations caused him to receive a longer (220-month) sentence than he would have received by pleading guilty.

"[A] defense attorney's failure to communicate a plea offer to his or her client constitutes deficient performance as a matter of law." *Guerrero v. United States*, 383 F.3d 409, 416 (6th Cir. 2004) (citing *Griffin*, 330 F.3d at 737); *Frye*, __ U.S. at __, 132 S. Ct. at 1408. This principle does not assist Wright because the Government never made the 10-year plea offer to Wright with sufficient definitiveness to make it binding on the Government. *Cf. Guerrero*, 383 F.3d at 417 ("The threshold issue in this case, of course, is whether the government ever extended a plea offer .... This is a purely factual issue.").

The Government never presented Wright or attorney Anderson with any written plea offer, let alone the 10-year plea offer. As to a verbal offer, the testimony during the §2255

15

hearing shows that at or near the time of the best case-worst case hearing, the Government, did not make the 10-year plea offer. Anderson's testimony establishes that the discussions at that time were problematic for Wright because of his criminal history. Anderson explained, "the government felt that [Wright] would qualify for an armed career criminal enhancement based on his record ...." (Doc. #169, PageID at 1730). This is why the Government was only willing at that time to offer "a straight plea to the charge" rather than the 10-year offer. Anderson's testimony on this point is credible because it is consistent with the historical facts concerning Wright's prior convictions and the with the then-unresolved issue of whether his prior convictions would result in the armed-career-criminal enhancement to his sentence. Under these circumstances, it was not surprising that the Government would only offer "a straight plea to the charge" rather than the 10-year offer.

The possibility of a better plea deal for Wright did not arise until one or two days before trial when AUSA Chema asked Anderson if there was a way to reach a plea deal involving the possibility Wright would only receive a ten-year sentence. Although Chema does not recall asking Anderson about this possible deal, Chema's testimony establishes that any such discussion would merely have explored the possibility of reaching a negotiated plea deal before trial. Chema testified that he would have left "formalized negotiations" to Bartlemay. (Doc. #175, PageID at 1823). This is consistent with Bartlemay's understanding that he was responsible for "the outcome of [Wright's] case[.]" (Doc. #169, PageID at 1766). And there is no evidence that Bartlemay engaged in any plea negotiations with Anderson.

16

To the extent that attorney Anderson understood Chema's inquiry to embody a definitive 10-year plea offer, Anderson's understanding was premature and overlooked its exploratory status.  If Wright had accepted the 10-year plea offer, many essential issues remained to be negotiated.  These issues include, for example, whether the Government would agree not to charge Wright with additional offenses arising from his conduct; whether Wright would forfeit the gun to the Government; and whether the final plea agreement would include a appeal waiver by Wright.  The parties had also not discussed what specific facts would be read into the record at the time of Wright's possible plea.  During later discussions about these issues, Wright would have been free to withhold his final agreement to plead guilty and proceed to a jury trial – even if he had accepted the 10-year offer at the time Anderson first informed him of it.  The Government would also have been free to withhold its final agreement without infringing Wright's constitutional rights.  *See Weatherford v. Busey*, 429 U.S. 545, 561, 97 S.Ct. 837,846 (1977) ("there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial."); *see also United States v. Sammons*, 918 F.2d 592, 601 (6th Cir. 1990).

In addition, Anderson obviously knew that the possibility of a 10-year-plea agreement was raised by Chema not Bartlemay, and Bartlemay was the AUSA responsible for the outcome of Wright's case.  Chema, moreover, recalls only that he "may have said: Is there a way we can work this out, a ten-year deal may have been something that might have been acceptable."  (Doc. #175, PageID at 1823).  This possibility – "that something might have been acceptable" to Government – is consistent with the many plea issues remaining to

17

be resolved and with the fact that Bartlemay, the AUSA responsible for the outcome of

Wright's case, was not present or directly involved in the limited Chema-Anderson

exchange.  At best for Wright, Anderson had only received an informal or exploratory offer

from Chema that, if Wright accepted, would have led to at least one (probably more)

additional conversation between Wright and Anderson; and between Anderson and

Bartlemay, if not Chema also, before the parties' agreement to the 10-year plea deal would

become finalized and sufficient to present to the Court.

Even if Chema's verbal offer constituted a binding commitment by the Government,

Anderson's testimony establishes that he told Wright about the 10-year offer but Wright

refused to accept it.  Anderson's testimony about this (during the §2255 hearing) was clear,

candid, and credible.  And he was simply more credible than Wright.  Anderson remembers

strongly recommending to Wright that he accept the 10-year plea offer, and he had a candid

discussion with Wright about why he should accept it.  Anderson's explanation of the

discussion was specific and clear as to what he remembered at what he did not.  He recalled

that during his discussion with Wright about the 10-year plea offer, he (Anderson) assessed

the case, including the weakness in the defense theory Wright wanted to present at trial –i.e.,

the gun at issue did not belong to Wright; it belonged to his roommate Rodney Chambers.

The weakness, Anderson explained to Wright, was the uncertainty that Chambers would go

through with testifying at trial that he – Chambers – owned the gun at issue.  Anderson

informed Wright that there was a problem with Chambers "actually going forward with it.

The reason being because [Chambers], in effect, would be pleading out to a federal felony

18

admitting in open court and more than likely would be arrested as soon as he got off the witness stand." (Doc. #169, PageID at 1753-54). True to Anderson's concern, Chambers invoked his Fifth Amendment right to remain silent at trial on the issue of gun ownership. *Id*., PageID at 1752-53.

Anderson also discussed with Wright the problem he faced regarding constructive possession. Anderson explained to Wright that even if Chambers testified he owned the gun and even if the jury believed Chambers, Wright still faced the problem of constructive possession, "the proximity," and the location of the gun. *Id*., PageID at 1754. Anderson thus advised Wright that he faced "legal issues with whether or not that would absolve him from any association with the gun...." *Id*. And, when advising Wright to accept the 10-year plea offer, Anderson told Wright that "he needed to take the deal because of the 15-year minimum sentence that could be imposed but also what his guideline range would be, and we had gone over that in depth...." *Id*., PageID at 1754-55. Despite all this, Wright thought he had a good chance of success with the case and was "pretty hard set on going to trial." (Doc. #169, PageID at 1752).

At times, Anderson could not recall specifics. For example, he could not remember when the case was first set for trial. He did not recall anything about what occurred during the best case-worst case hearing even though he was present. He also could not remember specific meetings with Wright at that time because it had "been a long time and there's been a lot of clients ...." (Doc. #169, PageID at 1731). Anderson further testified that to the best of his memory, he discussed the 10-year plea offer with Wright in the Montgomery County

19

Jail, although it might have occurred in the Miami County Jail.  He also did not remember the exact day he discussed the 10-year plea offer with Wright, and he could not remember if the Government put any time limits on the offer.  He acknowledged that his memory on these points was "fuzzy."  *Id*., PageID at 1755.  Anderson's straightforward candor and logical explanation for his fuzzy memory on these points bolsters, rather than detracts from, his credibility.

Wright's testimony on the critical historical facts was less than credible.  His demeanor and manner of testifying during the evidentiary hearing detracted from his credibility.  He appeared especially uneasy as he testified.  Most witnesses, of course, exude a certain degree of nervousness while testifying; Wright's uneasiness was beyond the norm. He looked as though he was trying to recall the answer most supportive of his ineffective assistance of counsel claim rather than simply answering the questions based on the events as he honestly remembered them.  Simply put: he appeared disingenuous.

In addition, Wright's general testimony exaggerated his lack of understanding, while his more specific answers demonstrated he understood much due to his discussions with Anderson.  Wright generally testified that attorney Anderson discussed a lot of things with him but Wright "didn't understand what [Anderson] was talking about."  (Doc. #169, PageID at 1779).  On further questioning, however, Wright revealed that he understood, at minimum, certain fundamental aspects of his case.  He understood at the time he was indicted that he was charged with having a gun and that the Government believed the gun at issue belonged to him because it was found in his house.  *Id*., PageID at 1779-80.  He also

understood that his theory of defense would focus on showing that the gun belonged to someone else. Most significantly, Wright answered "Yes" to the question, "Was all that discussed with Mr. Anderson and you?" *Id.*, PageID at 1780.

Wright's hearing testimony, moreover, was inconsistent with his affidavit, which he filed in support of his §2255 Motion. Wright testified that he first learned about the Government's 10-year plea offer when he read Anderson's affidavit. Accepting this as accurate would mean that Wright did not learn about the 10-year plea offer until sometime after July 19, 2010, when the Government submitted Anderson's affidavit in support of its Response (Doc. #152) to Wright's §2255 Motion. Wright's affidavit, however, reveals a different historical fact: he knew about the 10-year plea offer well before Anderson's affidavit first appeared in the record. Wright avers in his affidavit, "I told Mr. Anderson that I wanted to plead guilty and *accept the ten (10) years* from the government, b[ut] Anderson ignored me and disregarded the Court[']s instructions, lost the trial and caused me to receive a much high[er] sentence...." (Doc. #145, PageID at 1420)(emphasis added). The plain meaning of this establishes that before trial Wright knew about and wanted to accept the Government's 10-year plea offer. For Wright's testimony – that he did not learn about the offer until much later – to be consistent with his affidavit, the phrase "accept the ten (10) years from the government" would have to be ignored. This is so because the presence of the phrase reveals that he knew about – and wanted to accept – the 10-year plea offer before trial. This aspect of Wright's affidavit also means that he knew about the 10-year plea offer at the time he filed his §2255 Motion and affidavit, rather than first learning it when he read

21

Anderson's later-filed affidavit, as he claimed during the evidentiary hearing.  These inconsistencies along with his exaggerated his lack of pre-trial knowledge about the 10-year plea offer, detract from Wright's credibility.

In sum, several main facts emerge from the evidence presented by the parties:  (1) shortly before trial, the Government (through Chema) presented Anderson with the possibility that it would accept a plea agreement based, in part, on Wright's acceptance of the 10-year plea offer;  (2) attorney Anderson conveyed, and strongly urged Wright to accept, the Government's possible 10-year plea offer;  (3) attorney Anderson explained to Wright why he should accept the plea offer because of the main problem with the defense theory (its reliance on Rodney Chambers' unlikely testimony) and because of the longer possible minimum 15-year sentence Wright could receive if he proceeded to trial and was found guilty; and (4) contrary to Anderson's strong advice, Wright rejected the 10-plea offer because he believed he would prevail at trial.

In light of these facts, despite the diligent efforts of Wright's present counsel, Wright has not met his burden of demonstrating that Anderson's performance as it relates to the 10-year plea offer was objectively unreasonable or that his representation of Wright was constitutionally deficient.  *See Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)("In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence...." (quoting *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366 (1985)).  Consequently, Wright's ineffective assistance of counsel lacks merit.

**IT IS THEREFORE RECOMMENDED THAT:**

1.    Petitioner Dwaine Wright's motion to vacate, set aside or correct sentence (Docs. #s 145, 188) be DENIED and DISMISSED with prejudice and that Respondent United States' corresponding motion to dismiss (Docs. #152) be GRANTED as to Wright's sole remaining claim of ineffective assistance of trial counsel;

2.    A certificate of appealability and leave to proceed *in forma pauperis* on appeal be **DENIED**; and

3.    The case be terminated on the docket of this Court.


February 28, 2013

                                                      _____s/Sharon L. Ovington_____
                                                             Sharon L. Ovington
                                                    Chief United States Magistrate Judge


23

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).